**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**REGGIE L. AIKINS,**

       **Plaintiff,**

**vs.**                                            **No. CIV -07-1168 RB/RLP**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       **Defendant.**

MAGISTRATE JUDGE'S ANALYSIS
AND
RECOMMENDED DISPOSITION[1]

Plaintiff filed his Complaint on November 19, 2007, seeking review of a final decision of the Commissioner of Social Security [hereinafter Commissioner] denying disability insurance benefits and supplemental security income. [Docket No.1]. The matter has been fully briefed by the parties and has been referred to this court for report and recommendation. The court recommends the Commissioner's decision be REVERSED and JUDGMENT be entered in accordance with 42 U.S.C. § 405(g), REMANDING the case for further proceedings consistent with this opinion.

**I.**    **Procedural History**

Plaintiff applied for benefits on July 28, 2004, alleging a disability that started on January 1, 1985, prior to his 5th birthday. [Tr. 43-46, 224]. His applications were denied initially and on reconsideration [Tr. 40, 210]. Plaintiff requested a hearing before an administrative law judge [ALJ herein], which was held on October 19, 2006. [Tr. 316-335]. The ALJ issued a decision denying

---

[1]Pursuant to 28 U.S.C. §636(b)(1), within ten [10] days after a party is served with a copy of this Analysis and Recommended Disposition, either party may, file written objections to such proposed findings and recommendation. A party must file any objections within the ten [10] day period if that party seeks appellate review of the proposed findings and recommendations. Failure to timely file objections with the court will be deemed a waiver of appellate review. Hill v. SmithKline Beecham Corp., 393 F.3d 1111, 1114 (10th Cir.2004).

Plaintiff's claims on January 29, 2007. [Tr. 18-26]. The Appeals Council declined review on October 12, 2007. [Tr. 5-7]. Accordingly, the ALJ's decision stands as the final agency decision. Doyal v. Barnhart, 331 F.3d 758, 759 [10th Cir.2003].

## II.     General Legal Standards

The court's standard of review is set forth in 42 U.S.C. §504(g), which provides that "the findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." I review the Commissioner's decision to determine only whether the decision was supported by substantial evidence and whether the Commissioner applied the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).

An individual shall be determined to be under a disability only if he can establish that he has a physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents them from engaging in substantial gainful activity. The physical or mental impairment must be of such severity that the claimant is unable able to perform past relevant work or any other type of substantial gainful work existing in the national economy. 42 U.S.C. §423(d).

The Commissioner has established a five-step sequential process to evaluate whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920 (2006); Allen v. Barnhart, 357 F.3d 1140, 1142 (10th Cir .2004); Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Williams v. Bowen, 844 F.2d 748, 750 (10th Cir.1988). In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity, whether he has severe impairments, and whether the severity of his impairments meets or equals the severity of any impairment in the Listing of Impairments [20 C.F.R., Pt. 404, Subpt. P, App. 1]. Id. at 750-51. If claimant's impairments do not  meet or equal the severity of a listing, the Commissioner

assesses his residual functional capacity ["RFC"]. 20 C.F.R. §§ 404.1520, 416.920. This assessment is used at both steps four and five of the process. Id. After assessing claimant's RFC, the Commissioner evaluates steps four and five, in order to determine whether the claimant can perform his past relevant work, or whether he is able to perform other work in the national economy. Williams, 844 F.2d at 751. In steps one through four the burden is on claimant to prove a disability that prevents performance of past relevant work. Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir.2001); Williams, 844 F.2d at 751 n. 2. At step five, the burden shifts to the Commissioner to show other jobs in the national economy within claimant's capacity. Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir.1999).

**III.   Factual Background**.

A chronology of facts is attached hereto as Appendix A. For the purposes of the issues raised in this appeal, the following facts are relevant:

Plaintiff was 25 years old at the time of his administrative hearing. He is a high school graduate with several failed attempts at employment and higher schooling. None of his past work qualifies as substantial gainful activity.

Plaintiff has had intermittent mental health care, frequently in conjunction with legal problems. He carries a diagnosis of personality disorder with borderline and anti-social traits, impairments which the ALJ found to be severe. He has been non-compliant with recommendations to take medication and receive counseling.

A Mental Residual Functional Capacity evaluation prepared by an agency physician, Dr. Sharlfian, and referenced by the ALJ, identified the following functional limitations:

(1)   non-significant to moderate limitation in the ability to maintain attention and concentration for extended periods;

    (2)    moderate limitation in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace and without an unreasonable number and length of rest periods, and

    (3)    moderate limitation in ability to interact appropriately with the general public.

## IV. Vocational Testimony

After obtaining a list of Plaintiff's past work [Tr. 332], the ALJ asked the vocational expert what jobs Plaintiff could perform if he had a moderate social impairment. [Tr. 333]. The vocational expert stated that Plaintiff would be able to perform the jobs of fast food worker, busser and dishwasher.   [Tr. 333].  Plaintiff's attorney asked the vocational expert to assume the additional impairment identified by Dr. Sharlfian: moderate limitation in the ability to complete a normal workday and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without any reasonable number and length of rest periods. [Tr. 333]. The vocational expert stated that adding this limitation would reduce available jobs by one-half. Id.

## V. The ALJ'S Decision

The ALJ found:

    (1)    Plaintiff had engaged in no substantial gainful activity. [Step 1].

    (2)    Plaintiff had a severe mental impairments of personality disorder with borderline and anti-social traits. [Step 2].

    (3)    Plaintiff's impairment, alone or in combination with other non-severe impairments, did not meet or medically equal the criteria for a listed impairment. [Step 3].

    (4)    Plaintiff's RFC was reduced due to non-exertional mental limitations consisting of moderate impairment in his ability to interact appropriately with the public, co-workers and supervisors, and moderate impairment in his ability to maintain socially appropriate behavior, accept instructions and respond appropriately to criticism from

>  supervisors.
>
> (5) Plaintiff was not entirely credible.
>
> (6) Plaintiff had no past relevant work. [Step 4]
>
> (7) Plaintiff could perform the jobs of dishwasher, table busser and fast food worker.

The ALJ took administrative notice from unidentified publications that these jobs exist in significant numbers in the national economy. [Step 5].

Based on this analysis, the ALJ determined that Plaintiff was not disabled.

## VI. Issues Raised on Appeal.

Plaintiff raises the following issues:

> A. Whether the ALJ's credibility assessment complied with applicable legal standards.
>
> B. Whether the ALJ complied with the narrative discussion requirements documenting his RFC assessment.
>
> C. Whether the ALJ posed an adequate hypothetical question to the vocational expert.

## VII. The ALJ complied with applicable legal standards in assessing Plaintiff's Credibility.

In reviewing a credibility determination, the court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." Casias v. Sec'y of Health and Human Services, 933 F.2d 977, 801 (10th Cir. 1995). Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings. Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995). The ALJ must explain why specific evidence supports the conclusion that a claimant's subjective complaints are not credible, and must "articulate specific reasons for questioning the claimant's credibility. . ." Kepler, Id.

In finding that Plaintiff's testimony was not entirely credible, the ALJ discussed and relied upon Plaintiff's activities of daily living, as well as history given to a consulting psychologist and

the psychologist's observations of Plaintiff's demeanor and mental state and results of testing of Plaintiff's intellectual abilities. (Tr. 23-24).

I find that the ALJ applied correct legal principles in assessing Plaintiff's credibility, and that substantial evidence supports that assessment.

The ALJ's findings regarding Plaintiff's lack of credibility does not compel a finding of not disabled. The ALJ must continue with the sequential evaluation process, including evaluation of Plaintiff's RFC. Thompson v. Sullivan, 987 F.2d 1482, 1490 (1993).

**VIII. The ALJ failed to apply correct legal principles in assessing Plaintiff's Residual Functional Capacity.**

Social Security Ruling 96-8p provides that the RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts ... and nonmedical evidence." The ALJ must explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted. SSR 96-8p, 1996 WL 374184 at *7.[2]

The ALJ found that Plaintiff had moderate impairment in his ability (1) to interact appropriately with the public, co-workers and supervisors, (2) maintain socially appropriate behavior, and (3) accept instructions and respond appropriately to criticism from supervisors. (Tr. 21).

The ALJ did not include in his RFC determination any limitation in Plaintiff's ability to

---

[2]SSR rulings are binding on an ALJ. 20 C.F.R. § 402.35(b)(1); Sullivan v. Zebley, 493 U.S. 521, 530 n. 9, 110 S.Ct. 885, 891 n. 9, 107 L.Ed.2d 967 (1990); Nielson v. Sullivan, 992 F.2d 1118, 1120 (10th Cir.1993).

complete a normal work day/work week without interruptions from psychologically based symptoms or to perform at a consistent pace without an unreasonable number and length of rest periods. This limitation was specifically included in the Mental Residual Functional Assessment prepared by the state agency consultant, Dr. Sharlfian. The ALJ stated that he considered Dr. Sharlfian's opinion, and that his decision was "largely consistent" with Dr. Sharlfian's findings. (Tr. 24). SSR 96-8p states that if the RFC assessment conflicts with an opinion from a medical source, the ALJ "must" explain why the opinion was not adopted. However, the ALJ never explained why he rejected this portion of Dr. Sharlfian's assessment. ALJ was required to not only discuss the evidence he relied upon, but also the uncontroverted evidence not relied upon and the probative evidence he rejected. Clifton v. Chater, 79 F.3d 1007 (10th Cir.1996). The ALJ did not acknowledge that he was rejecting portions of the assessment, nor did he explain how the material inconsistencies in the medical evidence were considered and resolved.

The ALJ selectively read Dr. Sharlfian's report, thereby substituted his own opinion for that actually expressed by Dr. Sharlfian. This approach is improper. Degan v. Barnhart, 314 F.Supp.2d 1077, 1086 (D.Kan.,2004), citing Switzer v. Heckler, 742 F.2d 382, 385-86 (7th Cir.1984). Thus, the ALJ failed apply correct legal principals in evaluating Plaintiff's RFC.

**IX.    The Hypothetical Question posed to the Vocational Expert Did Not Relate with Precision All of Plaintiff's Claimant's Impairments.**

The ALJ did not pose a traditional hypothetical question to the vocational expert. Instead, he asked the vocational expert to list Plaintiff's past relevant work, and to assess whether "moderate social impairment" would eliminate any of those jobs. (Tr. 332-333). This description of Plaintiff's mental limitations is not as detailed or extensive as the limitations the ALJ found were present: moderate impairment in the ability to interact appropriately with the public, co-workers, supervisors,

maintain socially appropriate behavior, accept instructions and respond appropriately to criticism from others. (Tr. 21). A hypothetical question must relate with precision all of a claimant's impairments in order to constitute substantial evidence to support the Commissioner's decision. Hargis v. Sullivan, 945 F.2d 1482, 1492 (10th Cir. 1991). The short hand "moderate social impairment" used by the ALJ in the question posed to the vocational expert does not adequately described the limitations found by the ALJ, and therefore does not relate with precision all of Plaintiff's impairments. Accordingly, the vocational experts testimony does not constitute substantial evidence to support the Commissioner's decision.

In recommending that this matter be reversed, I do not suggest any given outcome upon remand. Remand " simply assures that the correct legal standards are invoked in reaching a decision based on the facts of this case." Huston v. Bowen, 838 F.2d 1125, 1132 (10th Cir.1988).

## X.     Recommended Disposition

For these reasons, I recommend that Plaintiff's Motion to Reverse be granted, and that this case be remanded to the Commissioner for additional proceedings to include:

A. Assessment of Plaintiff's RFC in a manner which comports with Social Security Ruling 96-8p and Clifton v. Chater, 79 F.3d 1007 (10th Cir.1996);

B. Testimony from a vocational expert based upon hypothetical questions which relate with precision all of Plaintiff's impairments.

                                                         Richard L. Puglisi
                                                         United States Magistrate Judge

Appendix A

Plaintiff was born on March 13, 1981. [Tr. 43]. At the time of his administrative hearing, he was 25 years of age. [Tr. 319]. His claim for benefits is based upon alleged mental impairment. [Tr. 90-93, 40-42, 47-48, 210-212].

Plaintiff was evaluated by a neurologist, D. Gregory Gorman, M.D., on November 11, 2000, in connection with a probation violation[3]. At that time he was enrolled in an alternative high school and was working as a telemarketer. [Tr. 135, 73]. Dr. Gorman conducted a neuro-behavioral examination, consisting of interview, history, observation[4], mental status exam[5] and neurological exam[6]. Dr. Gorman did not render a formal diagnosis, but indicated that

> We may be speaking of a conduct disorder on the basis either of some tendency to bipolar affective disorder which is in his family, first manifested in childhood, or some behavioral interaction. Certainly there could have been some social interaction problems in school that the led to his school failure. [Tr. 138].

Plaintiff graduated from high school in 2001. [Tr. 279, 292, 320, 322].

The next record of mental health care is contained in a mental health assessment from Rio

---

[3]According to the history given to Dr. Gorman, Plaintiff's behavior throughout school was indicative of "dyscontrol" evidenced by school failure and conduct disorder. [Tr. 135, 138]. He began running away from home and being truant from school at age 14, and eventually joined a gang. Id. He was convicted of assault and battery prior to November 2000 [Tr. 293 309-310], and jailed for four months in 2002 for probation violation [Tr. 256-257, 260, 324]. He successfully completed probation in December 2002. [Tr. 241].

[4]"*Appearance and behavior*: Tall male, stretched out in his chair, apparently unconcerned initially; however, as we launch into the examination he becomes far more interested, animated and quite friendly by the end of the examination. *Thought Form and Content*: There is no illogicality or loose association, no hallucinations or delusions. *Mood and Affect*: Relatively cheerful and euthemic, though we would have to find out about the psychiatric hospitalization. I think it was for conduct disorder but we will have to hear more." [Tr. 136].

[5]The only abnormality noted was with Executive Function Tasks. [Tr. 137].

[6]Neurolgical testing was normal. [Tr. 137-138].

Rancho Family Health Center ("RR Health Center:, herein), dated December 2001.[7]  He had recently been discharged from a drug treatment program for attitude problems and non-cooperativeness. [Tr. 289, 295, 297-298].  Plaintiff was placed on Wellbutrin, an anti-depressant, and by December 31, 2001, he reported that his mood and improved and he was more productive. [Tr. 287].  On January 24, 2002, Dr. Smith at RR Health Center diagnosed dysthymic disorder and polysubstance abuse [Axis I], Personality disorder NOS [Axis II] and assigned a GAF [both current and past year] of 45.[8]  [Tr. 279-280].

Plaintiff obtained part time and then full time employment and continued to do well for several months.  [Tr. 274, 271, 270, 269, 268, 267, 265].   He stopped attending counseling sessions in April 2002, and by June 2002 was again in legal trouble, spent eleven days in jail,  lost his job and was drinking.  [Tr. 260-61, 248].  By mid June, he had resumed counseling, stopped drinking, his mood had stabilized and he was complying with all terms of his probation.  [Tr. 255]. By October 2002 he was doing well, had not used drugs or alcohol for three months, his mood was stable, and he was attending school. [Tr. 242-244].

On February 13, 2004, Plaintiff was evaluated by Matthew Poling, M.D., complaining of persistent anxiety and nervous.   Dr. Poling did not record a mental status exam.  He assessed Plaintiff as having depression and anxiety, adjusted the Wellbutrin dosage, and prescribed Zoloft

---

[7]There are three versions of this document in the administrative file, the first appearing at Tr. 292-296, and signed Joseph Bader, L.P.C., on December 13, 2001, the second appearing at Tr. 297-302 and signed by Mr. Bader on December 17, 2001, and the third appearing at Tr. 308-313 which is not signed or dated, but  includes a  reference an event occurring in 2002.  The court assumes the second report is a corrected or supplemented version of the first, and that third is the final report, prepared in 2002.

[8]A GAF score of 45 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34, 4th ed. Text Revision 2000] [DSM-IV TR, herein].

for anxiety. [Tr. 162-164].

The next medical record contained in the administrative file is a report of consultative examination prepared by a psychologist, Glen McClure, at the request of the Disability Determination Unit, dated December 29, 2004. [Tr. 174-178]. Plaintiff admitted that he had stopped taking anti-depressant medication four months earlier, and had not filled prescriptions for Wellbutrin or Prozac. Dr. McClure noted Plaintiff's daily activities[9], school[10], work[11] and legal history, and conducted a mental status examination.[12] Socially, Dr. McClure described Plaintiff as easily engaged, that he socialized with friends most evenings, that he had a "fair" relationship with his siblings, argued a lot with his mother, got along well with his father and was about to break up with his girlfriend.

Based of the foregoing, Dr. McClure reach the following diagnosis:

Axis I          311 Depression NOS [he reported some symptoms of depression, but
                failed to meet the criteria for a major depression]

---

[9] Plaintiff lived in his own apartment. He slept until 11 a.m. and retired between midnight and 1 p.m., taking nap between 1 and 3 p.m. He watch TV, hung out with friends, shopped for necessities, and took care of his apartment.

[10] Plaintiff stated he had been in special education since 3rd grade, had been suspended from school for behavioral problems, graduated from high school, had attended a school of cosmetology but quit going and that he had earned 6 college credits. [Tr. 176].

[11] Plaintiff identified four prior short term jobs, three of which were terminated due to problems at work or incarceration. [Tr. 177].

[12] *General Appearance, behavior and speech*: Well nourished and developed; hygiene and grooming good. Neatly dressed. Hair neatly cut short. Speech fluent with appropriate rate, tone and volume. At time speech punctuated with vulgarities. *Thought process*: organized, logical and coherent. No disorganizations, tangential circumstantiality or loosening of association. *Thought content:* Denied current suicidal or homicidal ideation. *Perceptual Abnormalities*: No evidence of hallucinations or perceptual abnormalities. *Sensorium and Cognitions:* Oriented to person, place, time and circumstances. General fund of knowledge and intellectual level is average. *Memory, Concentration: [*examples listed]. *Insight:* Limited, with little understanding of how psychological and environmental factors influence his condition. *Judgment: [*examples listed]. *Prognosis:* Guarded due to previous noncompliance and lack of motivation. [Tr. 177-178]

|         |                                      |
|---------|--------------------------------------|
|         | There is no support for the alleged PTSD |
|         | V15.81 Noncompliant with treatment   |
| Axis II  | Antisocial personality traits       |
| Axis III | None                                |
| Axis IV  | None                                |
| Axis V   | GAF 65[13]  [Tr. 178].              |

Dr. McClure felt that Plaintiff's conditions were treatable, but that he prognosis was guarded due to non-compliance and lack of motivation.  [Tr. 178].

A Mental Residual Functional Capacity Assessment was completed by Mishal Sharlfian, M.D., on or about January 29, 2005, based on a review of Plaintiff's records. [Tr. 183-200].  The MRFCA noted the following limitations:

(1) non-significant to moderate limitation in the ability to maintain attention and concentration for extended periods;

(2) moderate limitation in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace and without an unreasonable number and length of rest periods, and

(3) moderate limitation in ability to interact appropriately with the general public.

[Tr. 197-198].

In support of these conclusions, Dr. Sharlfian wrote:

> 23 y o male indicates special ed at school but records' secretary cannot find that at time   Had some sx substance abuse. Wellbutrin for ADD.  IP for depression 1989, 1999 20 days substance abuse & depression TX.  Currently has scripts for Wellbutrin & Prozac but he never filled them.
> Going to college, has own apt, can use a microwave, shop, clean apt, has a driver's license, socializes with friends, has some problems w/ concentration, limited insight

---

[13] A GAF score between 65-70 indicates some mild symptoms [e.g., depressed mood and mild insomnia] or some difficulty in social, occupational, or school functioning [e.g., occasional truancy, or theft within the household], but generally functioning pretty well, has some meaningful interpersonal relationships.  DSM VI-TR, Id.

12

> – needs to be compliant with treatment. GAF 65. Intellectual level and general fund of knowledge average.

[Tr. 195].

Plaintiff was next seen for mental health issues approximately one year later, November 24-25, 2005, when he was admitted to a psychiatric facility.[14] [Tr. 227, 232]. He stated that previously he done well on anti-depressant medication, but had not taken any for two years. [Tr. 227-228, 232]. He was discharged after approximately 12 hours at his request, with a diagnosis of Major Depressive Disorder, severe, recurrent, instructions to make an appointment with the mental health eligibility center, and a prescription for Wellbutrin. [Tr. 229-230, 232].

Another year passed before Plaintiff sought mental health care. On October 12, 2006, one week before his administrative hearing, Plaintiff was seen at RR Health Center complaining of depression following a breakup with his girlfriend and separation from his new-born child.[15] [Tr. 235-236, 240]. On November 1, 2006, Plaintiff was evaluated by Charles Hauser, M.D., [Tr. 303-307]. Plaintiff stated that his current depression had begun three months earlier. He again complained of missing his new-born child, and stated that he was depressed, inactive, slept poorly and was not interested in work or play. [Tr. 303-304]. He admitted that he had stopped taking antidepressants, apparently in 2002 or 2003, and had not taken anti-depressants following his wrist-cutting incident in 2005. [Tr. 303]. No abnormalities were noted in mental status examination. Dr.

---

[14] Records of this hospitalization were submitted to the Appeals Council. [Tr. 4]. Although not available to the ALJ, the ALJ did refer to Plaintiff's testimony concerning this hospitalization in his decision. [Tr. 22]. The Appeals Council stated that these records were considered in the decision not to review the ALJ's decision. [Tr. 5-6,8].

[15] Records of the October 12, 2006 visit and the follow up visit of November 1, 2006 were submitted to the appeals counsel. [Tr. 4]. The Appeals Council stated that these records were considered in the decision not to review the ALJ's decision. [Tr. 5-6,8].

Hauser diagnosed Major Depression, Recurrent [Axis I], Mixed Personality disorder with Cluster B features [Axis II] and noted that his major stressor was separation from his newborn son. [Tr. 305]. He assigned a past year GAF of 70, current GAF of 60[16] and prescribed a new anti-depressant [Tr. 305].

Plaintiff testified that he had behavioral issues throughout elementary and secondary school, and was suspended or expelled multiple times. These problems also occurred in college and vocational school. He stated that he has had numerous sort term jobs from which he was fired for not showing up. He last worked three or four months before his administrative hearing and currently spent his time cut off from friends, staying in his room, watching TV, talking on the phone and sleeping. [Tr. 128-131, 177, 111, 329- 331, 323-325, 68-74]. He stated that he wanted to obtain counseling and medication, but that because of his past history didn't know if he would continue to be compliant with medical advise to do so. [Tr. 327-328, 331-332].

---

[16]A GAF of 60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. DSM IV- TR, Id.